## BRUNSON VS. MARTIN.

Where a defendant elects to use his claim against the plaintiff for damages, by way of recoupment, he cannot have a balance found in his favor, as in case of set-off.

To an action by an overseer and manager of a plantation and negroes for his wages as such, the employer may recoup any damages he may have sustained by an imperfect performance of the contract on the part of the overseer—as where he has violated the contract in its terms and spirit.

In such action the claim for damages being on account of the killing of one of the slaves of the employer by the overseer, to authorize recoupment for such damages, it must appear, from the evidence, that the killing arose from the overseer's misman-agement—that he killed the slave negligently and without necessity.

At common law, a party could not maintain an action for damages arising out of a felony, until after a trial upon a criminal prosecution; but our Legislature has changed this rule. (*Dig., p.* 428.)

*Appeal from Hempstead Circuit Court.*

Hon. SHELTON WATSON, Circuit Judge.

CURRAN & GALLAGHER, for appellant.

S. H. HEMPSTEAD, for appellee.

Mr. Justice SCOTT delivered the opinion of the Court.

Martin sued Brunson, in the Hempstead Circuit Court, to recover, in assumpsit, the value of services rendered as overseer, in the year 1853. The latter pleaded *non-assumpsit*, and with his plea, filed a notice to the plaintiff, as follows, *to wit :*

"Take notice, that at, and upon the trial of this cause, I shall introduce testimony, and prove that you did not keep and perform the contract between us, in said suit specified, but on the

contrary, did break and violate the same, in this; that you, without necessity, and contrary and against your duty, as my overseer, and manager upon my farm, did wrongfully kill and destroy my property, then under your care and control, as my overseer and manager, by virtue of the contract in said suit specified, *to wit :* a negro slave named *Nathan*, of great value, *to wit :* of the value of fifteen hundred dollars, and that I shall cut-off, and keep back, the entire sum claimed by you in the suit aforesaid, for the damages by me sustained in this behalf, *and take judgment against you for the balance to which I am entitled on account of the same*, when and where you can controvert my claim to damages in this behalf, if you think proper.

ROBERT A. BRUNSON."

Although there is no question upon the record as to this notice, it may be remarked, in response to observations about it by the counsel on both sides, that it seems proper that it should be filed at the same time that the plea of *non-assumpsit*, which it accompanies, is filed ; as it appears was done in this case.  If the plaintiff should, in fact, be surprised by the notice, it would, of course, be a ground upon which he might apply to the court for a continuance, to enable him to prepare to repel the defence.

With regard to so much of the notice as we have marked in italics, it may be further remarked, that it has been held in New York, (*Batterman vs. Price*, 3 *Hill's Rep.* 171,) that, where a defendant elects to use his claim by way of *recoupment*, he cannot have a balance certified in his favor, as in case of set-off; but he must be content to have it go in abatement, in whole or in part of the plaintiff's demand:  And in Alabama, (*McLane vs. Miller*, 12 *Ala. Rep.* 643,) and New Hampshire, (*Britton ve. Turner*, 6 *N. H. Rep.* 481,) that after making such election, he cannot afterwards bring his cross-action for damages.

The cause was tried by a jury, who, after having heard the evidence, and receiving the instructions of the court, rendered a

verdict for the plaintiff, Martin, and judgment was given accor·dingly.

Brunson moved for a new trial upon the ground, that the instructions given on the motion of the plaintiff, were improper, and that the finding of the jury was contrary to law, and to the instructions, and to the evidence, and was without evidence to support it. The court overruled his motion, and taking a bill of exceptions, in which all the instructions given to the jury, and all the evidence produced before them, are contained, appealed to this court.

The matter of the instructions may be as well considered, under the circumstances of this case, before the evidence is stated, as afterwards. There were but three given to the jury ; two of them upon the motion of the plaintiff, and the other upon the motion of the defendant. The former were both excepted to, and it is upon them that the only question of law, as to the instructions, arises in the cause. They were as follows, *to wit:*

*1st.* " That to enable the defendant to recoup, it must appear to the jury that the death of the negro was the result of the plaintiff's mismanagement, as overseer for the defendant.

· *2d.* In order to enable the defendant to recoup, it must appear from the testimony, that plaintiff, negligently and without necessity, killed the defendant's slave."

The instruction given on the·defendant's motion was, " if the jury believe, from the evidence, that Martin did not perform his contract to oversee and manage for Brunson the slaves and farm of Brunson, but did break and violate the same in its terms and spirit, they should recoup the damage sustained by Brunson in that behalf, from the amount of the plaintiff's claim against Brunson, for overseeing."

These instructions distinctly informed the jury, when they are all taken together :   *1st.* That, if from the evidence, they should believe, that the plaintiff violated his contract with the defendant, in its terms and spirit, the former was liable to the latter, and that

the latter was entitled to recoup the damages arising from such breach of the plaintiff's undertaking : 2d. That in reference to the alleged violation of the contract, as connected with the killing of the slave, in order to authorize them to find the contract so violated, it must appear from the evidence that that arose from the plaintiff's mismanagement as overseer. And 3d. That unless it did appear from the evidence that the plaintiff, negligently and without necessity, killed the slave, the defendant was not entitled to recoup.

Thus, the jury were not only instructed that a negligent killing of the slave authorized recoupment, but they were instructed strongly inferentially, that a killing without necessity would constitute such negligent killing.

We think it clear enough, that there is nothing in those instructions of which the appellant can complain ; because, so far as they may be considered erroneous at all, that error is in his favor. And we can but find it very difficult to say that they are erroneous at all, in view of the just protection of the slave, which the common law of slavery, as it has grown up in the slave States of this Union, humanely affords to him. And yet, while we cannot see that we can safely displace that word "*necessity,*" as it appears in the charge of the court, with any other word, the stern mandates of that same common law of slavery, does, in truth, mitigate it in that connection, of some of its absoluteness of signification, in the absolute right it recognizes, not only of the master or his representative, but also of a stranger, as against the slave, to overcome by proper means, graduated upon principles of humanity and law, the slave's rebellion against the lawful authority of his master. See *Austin vs. The State,* 14 *Ark. Rep.* 567, as to the last point considered in that case. And in that sense, doubtless, the court and jury understood the word, or the verdict and the judgment could not have been rendered, nor the tion for a new trial have been overruled.

To determine from the evidence, whether the means used for overcoming the rebellion in this case, were graduated upon the

principles of humanity, was the appropriate province of the jury, as matter of fact and law, of which latter, *necessity* in the slayer, as thus understood, was given them by the court as a standard.

And although we cannot but say that we would be loath to subscribe to the verdict, it is still more difficult to say, that it is totally unsupported by the evidence, when we regard the legitimate province of the jury to judge exclusively of its weight.

In support of the verdict and judgment, the facts, which the evidence in the record conduces to prove, may be thus stated: 1*st.* Those preceding the killing of the slave. The slaves of the defendant "were a hard set to manage," and often found idle, in the absence of the overseer. The overseer of the previous year had found it necessary to flog some of them for idleness and other faults common to negroes, and he also had found them "harder to manage than some negroes he had managed."

In the morning of the day of the killing (which occurred in the afternoon of that day) the plaintiff said, at a store in the neighborhood of the plantation, in a conversation about the management of negroes on a farm, that he "had a rough and saucy set of hands to manage, and that, after that, if he ever overseed again, he would make the negroes obey him, or he would kill them." This was about 11 o'clock, and he appeared perfectly calm and in no way excited. Another witness stated that he remained at the store until two or three o'clock, and "was drinking," but "seemed to be in a good humor, and laughed and talked a good deal," and among other things, said, he was going to prove a mule for his employer, which had been taken up as an estray. Another witness, however, proved that, at three o'clock, the plaintiff showed no signs of being intoxicated.

The killing seems to have occurred about, or soon after this hour, and the facts attendant are, 2*d.* about, in substance, these: The plaintiff, having his whip in his hand, went into the field where the hands were picking cotton, and when approaching near to them, said to *Nath*, the slain, that he had "come for his shirt;" to which, *Nath* replied, that he "had pulled off his shirt

to the last overseer." The plaintiff, drawing a revolver, repeated to him that he "had come for his shirt, and intended to have it or hurt him." To which *Nath* replied, "*shoot and be damned*," the plaintiff simultaneously exploding a cap in his first effort to shoot, and at the same moment Nath commenced advancing upon the plaintiff, with some cotton in one hand, and nothing in the other, the plaintiff firing his pistol upon him, three or four times; until, at the last fire, *Nath* was near enough to knock the pistol up—*Nath* at the same moment himself falling down. The physician, who was called in, states, that there were upon the person of *Nath*, the wounds of three balls. "One, passing near his privates, lodged in his right thigh, on its way slightly wounding the penis. Another hit him near the left hip joint, but a little above and behind it; and the third struck him on the left side of the abdomen, and ranged rather down. This latter ball produced his death." And the same witness further states as his opinion, formed from the examination of the person of *Nath*, that "all the shots were made by some one, on the left side of the negro. The wounds could not have been made upon one who advanced directly to the shooter; if at all, while advancing, it must have been done while advancing with his left side to the shooter.

It was also proven, that Nath was a stout negro, weighing about 200 pounds, "with bodily strength enough to crush the plaintiff down," while the latter, it seems, was at the time "a cripple," and that it was the general custom of overseers to carry weapons.

In other respects the testimony makes out, fully, the case for the plaintiff, and that for the defendant—showing the plaintiff to have rendered services as an overseer for the defendant, from the spring of the year, from about the first of March, until he was discharged by the defendant, upon the killing of *Nath*, which was about the 15th of October: That they were worth from two hundred and fifty, to four hundred and fifty dollars; and that the value of Nath, at the time when he was killed, was from twelve to fifteen hundred dollars.

Brunson also read in evidence, without objection, a paper which was admitted by the plaintiff to have been signed by himself, which was in words and figures, as follows, *to wit:* "This is to certify, that I only claim of R. A. Brunson, two hundred and fifty dollars, as my wages for overseeing for him in the year 1853. This 15th day of May, 1854.

JAMES MARTIN."

There was also evidence to the effect, that Brunson's crop was, in the year 1853, a tolerably good one, although it did not turn out as well as the crops upon the adjoining farms. There was no testimony, otherwise, conducing to show that Martin had been negligent, or had otherwise imperfectly discharged his duties as overseer.

Under such a state of proof, we do not feel authorized to disturb the verdict, upon the ground that it is not supported by the evidence, in view of the province of the jury to judge exclusively of the weight of that adduced before them without exceptions to its competency; no question as to which latter was made on the motion for new trial.

As to the validity of the defence attempted to be sustained on the part of the defendant, it could not have been maintained upon the principles of the common law, until after the slayer had been first tried upon an indictment for the *homicide;* the excellent policy of that law preventing the person injured by the trespass, from seeking his own redress, until it should be first ascertained and determined by the proper tribunal what the justice of the State requires of the accused for the deed. If the law were otherwise, the common law supposed that persons injured would often obtain compensation for such trespasses, upon an agreement not to complain of the public wrong; and reparation would be made for the civil injury, to escape the justice of the country. *Morgan vs. Rhodes,* 1 *Stew. Ala. Rep.* 70; *Middleton vs. Holmes,* 3 *Porter's Rep.* 424. But our Legislature has changed this rule, and the civil injury is no longer merged in the felony. Our sta-

tute provides, that "in no case shall the right of action of any party, injured by the commission of a felony, be deemed or adjudged to be merged in such felony; but damages sustained thereby may be recovered in an action brought for that purpose. *Dig., chap.* 53, *sec.* 269, *page* 428.

The only remaining doubt would be, whether, although the owner could maintain his action for the value of his slave, he could insist upon it by way of recoupment. And as to this, there can be no doubt, we think, but that the principle upon which recoupment proceeds, is amply broad enough to sustain the defence. The latter was unquestionably based upon a supposed breach of one of the stipulations of the contract, upon which the plaintiff, sought to recover. *Van Buren vs. Diggs,* 11 *How. U. S. Rep.* 475. And it has been frequently held in other courts, that where an overseer sues for his wages, the employer may recoup any damages he may have sustained by an imperfect performance of the contract on the part of the overseer. *Hunter vs. Waldron,* 7 *Ala.* 753; *McLane vs. Miller,* 12 *Ala. Rep.* 643; *Jones vs. Deyer,* 16 *Ib.* 221. And in Pennsylvania it was held, in the case of *Hicks vs. Shener,* 4 *Serg. & Raw.* 249, that, in an action to recover compensation for services as house-keeper, evidence that the plaintiff had been guilty of the malfeasance of embezzling the goods of the defendant, might be given to defeat the action: Chief Justice TILGHMAN remarking, in that case: "whatever be the nature of the services for which the plaintiff demands compensation, I may show that those services were ill performed; for by such evidence, I do no more than meet the plaintiff in his own allegation. I prove that he did badly, what he ought to have done well.

"The plaintiff claimed compensation for services as a housekeeper. It is the duty of the house keeper to take care of the house-hold goods. The defendant offered to prove that the plaintiff did not take care of his goods, and to show the particular manner in which she violated her trust, *viz:* that she sent sundry articles to her daughter's house, and suffered her to make use of

them. How is neglect of duty to be shown, but by showing the particular acts of negligence or malfeasance?" And Mr. Justice GIBSON, said: "I grant that a mere tort, unconnected with the plaintiff's conduct as house-keeper, could not have any effect on her claim in that character. But the evidence rejected went to show, that, during the time she was in the defendant's service, she gave away various articles belonging to him, without his knowledge, &c. This was a breach, on her part, of the contract implied by the law, that she would behave herself in the execution of her office or trust with integrity and fidelity. 3 *Com.* 163. It, therefore, appears unjust that he should be compelled to treat her in the first instance as a person having faithfully executed her trust, and be turned round to an action against her, for a breach of her part of the agreement. This unnecessary circuity ought to be avoided. The merits of the defence can be tried in this form with as much convenience to the parties, as in a separate suit, and the judgment, if pleaded with proper averments, would be a bar to another action for the same cause." See, also, *Crowninshield vs. Robinson et al.*, 1 *Mason* 93 ; *Austin vs. Foster*, 9 *Pick.* 342; *The Allair Works vs. Guion*, 10 *Barb. Sup. Ct. Rep.* 55.

Upon the whole record, then, we find no error of law, for which the judgment ought to be reversed; and sustaining the verdict of the jury as we have done, there was no error in the court below, in refusing the motion for a new trial. Affirmed.